

CLERK'S OFFICE
A TRUE COPY
Feb 17, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Information associated with the cellular )
telephone assigned call number (612) 422-2739 )

Case No. **21-M-327 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 844 (n), (i) | arson; conspiracy to commit arson |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

BRADLEY KURTZWEIL   Digitally signed by BRADLEY KURTZWEIL
Date: 2021.02.17 16:14:50 -06'00'

*Applicant's signature*

ATF SA Bradley Kurtzweil

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 2-17-21

*Judge's signature*

City and state: *Milwaukee, Wis*

Hon. Stephen Dries, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

### Matter No. 2020R00323

I, Bradley Kurtzweil, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (612) 422-2739 that is stored at premises controlled by New Cingular/AT&T, a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require this same provider to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since March 2020. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training (approximately 1000 hours) at the Federal Law Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy.  That training included various legal courses related to Constitutional Law as well as search and seizure authority. Additionally, I have received training on how to conduct various

tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection.

4.     Prior to my employment with the ATF, I was a sworn Police Officer in the State of Illinois from March 2011 to March 2020.  I completed 12 Weeks (approximately 480 hours) of basic training at the Illinois State Police Academy from April 2011 to June 2011.

5.     My most recent position as a Police Officer, prior to my employment with ATF, was with the Bolingbrook Police Department in Bolingbrook, IL.  While employed by the Bolingbrook Police Department, I was a Patrol Officer from December 2012 until March 2020. From July 2017 until March 2020, I also served as an Evidence Technician, assigned to Patrol. During my time in Bolingbrook, I received 8 Written Recognitions and 2 Commendations.

6.     During my career as a Police Officer, I attended approximately 520 hours of additional training in areas including: evidence collection, interview/interrogation, arson and explosives, gang investigations; and drug investigations.

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.     Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of conspiracy to commit arson and arson of commercial property, in violation of Title 18, United States Code, Sections 844(n) and 844(i).

**PROBABLE CAUSE**

9.      On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The ATF subsequently deployed its National Response Team of arson investigators to Kenosha to process the fire scenes, collect video evidence, and identify potential suspects.

10.     On August 26, 2020, ATF and the Kenosha Police Department conducted a fire scene investigation at Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin. Investigators located two areas of separate fire damage, one on the outside of the building and one on the inside.

11.     Investigators also collected hours of surveillance videos from multiple locations, including Charlie's 10th Hole bar. The following facts are distilled from relevant video surveillance footage reviewed by law enforcement as part of this investigation.

12.     On August 24, 2020, at approximately 11:25 pm, multiple people walked southbound on a sidewalk toward Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin.  At approximately 11:26 pm, a male wearing a dark sweatshirt with white lettering used an apparent ignitable liquid to set fire to the north exterior of the bar.  At approximately 11:27 pm, this same group of people reacted to an unknown off-camera event by crouching and looking to the southwest.  In response to that same event, a male in the group, who was wearing a dark hoodie, light shorts, white shoes, and a light colored facemask, removed a handgun from his waistband and fired two rounds toward the southwest.  The male shooter walked with a distinct gait, as his toes pointed outward.  Investigators later recovered spent 9mm ammunition casings on the ground near the area where the shooting had occurred, and the analysis of those casings is ongoing.

13.     At approximately 11:28 pm, an unknown subject from the same group threw a flaming object through the front window of Charlie's 10th Hole bar.  At about this same time, some members of this group began to walk west, across 22nd Avenue, toward a CVS located at 3726 22nd Avenue.

4

14.    Approximately 14 people unlawfully entered that CVS store at approximately 11:30 pm on August 24, 2020.  The unlawful intruders included a heavyset black male wearing a dark facemask, backwards hat, and a red shirt with "Tom and Jerry" cartoon graphics.  A second intruder was a male wearing a red shirt, light colored shorts, and a shirt covering his head.  A third intruder was a black female with frizzy long hair, wearing black leggings and a light colored facemask.  A fourth intruder was a white male wearing dark colored camouflage pattern shorts and shirt. A fifth intruder was a male wearing a dark hoodie, light shorts, white shoes, and a light colored facemask, which is consistent with the appearance of the individual who discharged a firearm outside Charlie's 10th Hole bar.  Other intruders inside the CVS included a black male wearing an orange shirt; a male wearing a yellow sweatshirt; and a suspect wearing a dark hoodie with white lettering that spelled "The Sanneh Foundation," which is a non-profit organization located in St. Paul, Minnesota.

15.    The Kenosha Police Department responded to the CVS burglary and apprehended Jaquan Moore inside the store while other intruders fled.  Upon arrival, officers observed the bottom half of CVS's glass sliding doors were shattered and entered the building to check for subjects. Multiple people fled, but officers were able to apprehend Moore, who was wearing a white t-shirt around his head and face to conceal his identity, along with a gray shirt and dark pants. Officers located a silver hammer with a black handle and a flathead screwdriver with a black-and-red handle in the immediate area around Moore. Officers noted that cash drawers and pill bottles were strewn across the floor, and the store was in disarray. The pharmacy section of the CVS had hundreds of pill bottles strewn across the floor, one shelf of medication was tipped over, and the medication refrigerators were opened. CVS pharmacy completed an inventory and

5

found that $1,247.53 of controlled substances and $10,821.42 of non-controlled substances were missing from the store.

16.     For that crime, Moore was charged with burglary, in violation of Wisconsin Statute 943.10(1m)(a), the next day in Kenosha County Case No. 2020CF000973. According to publicly available court records, Moore's full name is Jaquan D. Moore, his date of birth is October 4, 1997, his phone number is (612) 802-8429, and his address is 1014 Rockefeller Lane, Unit 2, Madison, Wisconsin 53704.

17.     ATF later interviewed Moore twice, who eventually acknowledged that he had traveled with a group of people from the Twin Cities in Minnesota on August 24, 2020 to participate in "the riots" in Kenosha, Wisconsin. He said that he was standing next to the person who started the fire at Charlie's 10th Hole bar. Moore said that he left his cell phone in the vehicle of a person known to him as "George." Moore confirmed that the call number assigned to his cell phone is (612) 802-8429. Moore also said there were three vehicles that traveled together from Minnesota to Kenosha: a Dodge car, a white car, and a dark SUV. Moore said he was a passenger in the Dodge car.

18.     During a subsequent canvass of Kenosha, investigators located additional surveillance video from the Stella Hotel located at 5706 8th Avenue, Kenosha, Wisconsin. Review of this surveillance video showed that a Dodge car, white sedan, and dark SUV parked in the area behind the hotel on August 24, 2020 at approximately 9:30 pm— consistent with Moore's statement. Four individuals exited the Dodge car: two black males wearing pants; a white male wearing dark colored camouflage shirt and shorts; and a black male with long dreadlocks. Four males also exited the white sedan.

19.     The most distinct footage was generated of the five individuals exiting the dark SUV.  This footage depicted a black female with frizzy hair exiting the rear passenger area of the dark SUV.  The footage also shows another female exiting from the dark SUV's backseat. A heavyset black male can be seen exiting from the dark SUV's front passenger door, wearing a t-shirt with graphics similar to the aforementioned "Tom and Jerry" shirt.  A black male with facial hair can be seen exiting the driver door of the dark SUV, wearing shorts.  Finally, a thin, black male wearing a light colored facemask can be seen exiting the dark SUV's backseat, wearing light colored shorts and white shoes.  This black male had long dreadlocks that extended down to approximately the middle of his back. This same black male then can be seen putting on a dark hoodie and walking away from the SUV, exhibiting a distinct gate with his toes pointed outward.

20.     The dark SUV's license plate was later enhanced and found to be Nevada plate #798L96, which was assigned to a 2020 Nissan Pathfinder rental car owned by Hertz corporation.  According to records later obtained from Hertz, the Nissan Pathfinder was rented by Natasha Bennett at the Minneapolis International Airport on August 22, 2020 and returned on August 25, 2020.  Investigators initially believed Bennett was the black female referenced above, but later determined the female did not match the likeness of Bennett's Minnesota driver's license photograph.

21.     A query of people who have used Natasha Bennett's home address showed that Kannasysha Stevenson (DOB: 8/09/2001) had used the same address as Bennett. Investigators also located a video of Stevenson on Bennett's Facebook page This video from Bennett's Facebook page showed Stevenson with frizzy hair on August 19, 2020.  This same video from August 19, 2020 depicted Stevenson sitting in front of a birthday cake with

"Happy Birthday Kannasysha" printed on the cake. Bennett "tagged" Stevenson in the Facebook posting related to this video using Stevenson's Facebook account name: "NayNay Macc".

22.     Investigators reviewed the publicly available list of Facebook friends of Stevenson's "NayNay Macc" Facebook account and noted that she was Facebook friends with a Facebook account bearing the username "La Dave Llbd". "La Dave Llbd" was also a listed friend for Jaquan Moore on Moore's Facebook account "BackDooe Jq".

23.     Furthermore, investigators observed that "La Dave Llbd" was Facebook friends with "Anthony Clay (Stack Bundles)," who is also a Facebook friend to Moore. Investigators had previously reviewed a recorded jail call placed by Moore on August 25, 2020, in which Moore instructed the other party on the line to contact "Anthony Clay" via Facebook to retrieve Moore's belongings from Clay, including Moore's wallet, cellphone, and "scripts." Neither Moore's wallet nor cellphone were on his person at the time of his arrest inside the CVS. During another call, Moore said that he went into the CVS with others—that the others went in to steal Percocets, but he was the one who was caught. He admitted that he brought a screwdriver with him, but claimed he was unable to steal anything.

24.     While reviewing Stevenson's list of Facebook friends, investigators also identified an account with the profile name "Bullykapper Bubba". "Bullykapper Bubba" was observed to be a black male with braided long hair as well as facial hair. "Bullykapper Bubba" was also a listed Facebook friend for "Anthony Clay (Stack Bundles)" and "La Dave Llbd".

25.     "Bullykapper Bubba" posted a Facebook live video on September 10, 2020, which depicted a traffic stop conducted by law enforcement.  During the traffic stop, the user of the account is identified as "Allen" and a passenger in the vehicle named "Michael" is arrested for an outstanding warrant.  Law enforcement contacted the Hennepin County Dispatch Center in Minnesota and provided them the date, time, and first names "Allen" and "Michael," requesting any related records.  The Hennepin County Dispatch Center reported that at the corresponding date and time, Allen Michael King (DOB: 10/04/1995) was issued a traffic citation and his brother, Michael Valentino King (DOB: 3/28/2000), was arrested for an outstanding warrant.  Allen King's Minnesota driver's license photograph was compared to the image of the user of the "Bullykapper Bubba" Facebook account and law enforcement determined that the images appeared to be of the same person.

26.     A review of the publicly available timeline on Allen King's "Bullykapper Bubba" Facebook page showed various postings suggesting that King, Stevenson, and other associates from Minnesota were included in the group that committed various crimes at Charlie's 10th Hole Bar and burglarized the CVS. First, King posted that he was with the individuals associated with the Facebook accounts "La Dave Llbd" and "Get Emdone" on August 24, 2020 at 3:30pm.  Specifically, King indicated that he and these other two individuals were on a "money mission." In a "comment" appended to that same posting, King tagged another account, "SF Kevin vs Bullyloc", and wrote: "twin we woke up on mission." The "SF Kevin vs Bullyloc" account responded by writing "Factz." Law enforcement knows that it takes approximately five hours and thirty minutes to drive from the Twin Cities area in Minnesota to Kenosha, Wisconsin, such that the timing of this post is

9

consistent with the arrival of King's group near the Stella Hotel in Kenosha at approximately 9:30 PM on August 24, 2020.

27.     Then, a few minutes later, King posted a link to a news article related to the officer involved shooting in Kenosha, WI.

28.     Allen King's next Facebook post was a video on his timeline at 9:52 pm on August 24, 2020, in which he announced that he and his group were in Kenosha, Wisconsin. Law enforcement downloaded this video and observed that it depicted civil unrest.

29.     Allen King is also seen in this same video with a heavyset black male wearing a red shirt with "Tom and Jerry" graphics. The video then pans to show that King was walking with a larger group that included a male in an orange shirt and another male in a yellow sweatshirt. Additionally, King captured images of a black female with frizzy hair. The image of the black female is consistent with it being Stevenson, and also consistent with the female intruder inside the CVS.

30.     Later in the video, King is heard encouraging someone to open a building and start it on fire, but it is unknown if such action was taken. Further along in the video, King is seen walking next to a black male wearing a dark hoodie, light facemask, light colored shorts, and white shoes, similar to the shooting suspect from Charlie's 10th Hole bar. Near the end of the video, King and Stevenson are seen walking back towards a black SUV when King is heard repeating an unknown third party's admonition that, "We need to steal so we can start crashing through shit."

31.     A further review of King's Facebook page revealed he posted an image of himself and another person wearing the same outfit on August 27, 2020. King "tagged" the account "SF Kevin vs Bullyloc" in this picture and again referred to this person as his "twin." Based on this

10

"tag," it appears as if the user of the "SF Kevin vs Bullyloc" account is a thin, black male with long dreadlock hair. Based on (i) the consistency between the appearance of the shooter at Charlie's Bar and the appearance of the user of the "SF Kevin vs Bullyloc" account; and (ii) the August 24 posting wherein the user of the "SF Kevin vs Bullyloc" account affirms that he is on a "mission" with King on August 24, 2020, law enforcement believes that the shooter at Charlie's Bar is the user of the "SF Kevin vs Bullyloc" account.

      32.    In August 28, 2020, the Honorable Mary Wagner, of the Kenosha County Circuit Court, signed a search warrant for the historical location information associated with Moore's cell phone number. The listed subscriber for Moore's cell phone number appears to be one of the same people that Moore communicated with during jail calls. A preliminary review of this same location information showed that Moore's phone traveled from Minnesota to Kenosha on or about August 24, 2020, leaving the Twin Cities area at approximately 2:00 pm and arriving in the Kenosha area at approximately 8:50 p.m. Moore's cell phone was then stationary in Kenosha for several hours, including at the time of the arson. (He was arrested on August 24, 2020 at approximately 11:59 p.m.) On August 25, 2020 at approximately 12:22 a.m., Moore's cell phone returned from Kenosha to Minneapolis, Minnesota, arriving at approximately 6:00 a.m. (while Moore was in custody). On August 25, 2020 at approximately 5:21 p.m., the cellular device appeared to have powered off. Based on this course of travel and the aforementioned jail call wherein Moore directs a third party to retrieve his personal effects from his Facebook friend "Anthony Clay," law enforcement believes that (i) Moore and Clay were in Kenosha together the evening of August 24, 2020; and (ii) Clay came into possession of Moore's personal effects because Moore stated during his interview that he had left his cellphone (and likely other items) in the Dodge car.

33.     On October 20, 2020, ATF Special Agent Rick Hankins downloaded Facebook records for "Anthony Clay" pursuant to a federal search warrant. "Anthony Clay" is a black male later identified as Anthony Deshawn Clay (DOB: 10/15/1997). The Facebook records for Clay were inventoried as ATF Item #17.

34.     The booking photograph of Anthony Clay from the Minneapolis Police Department was compared to images depicted on the aforementioned "Anthony Clay" Facebook page, and the images appeared to be the same person.

35.     The following is a summary of information obtained from Clay's Facebook records:

36.     On August 24, 2020, at 11:57am, Clay sent the following message to the Facebook profile known by law enforcement to be used by David GARNER, "Finna be On my way! Getting oil changed". On this same date, at 1:16pm, Clay voice called GARNER via Facebook. On August 24, 2020, at 1:06pm, Clay attempted to video chat with the Facebook account used by Jaquan Moore.

37.     On August 24, 2020, at 1:17pm, Clay sent the following message to Facebook username "Deon Nolove Sanstad": "Let's go puss". Sanstad replied, "where we going", and CLAY wrote, "Wisconsin".

38.     Also on August 24, 2020, at 1:46pm, GARNER received the following message from Clay: "Here". GARNER and Clay then had a Facebook video chat at 1:49pm.

39.     On August 24, 2020, at 7:33pm, Facebook username "Davion Williams" sent Clay the following message: "what city yall in", to which Clay replied, "Almost to Milwaukee". At 7:36pm, Williams wrote to Clay, "stop at the next gas station," "we need to grab gas".

40.     On August 25, 2020, at 12:28am, Clay posted a video from inside a vehicle that showed crowds of people outside the vehicle.  The video included a printed statement "Wisconsin going crazy".

41.     On August 25, 2020, at 12:53am, Clay posted a video from inside a vehicle that was traveling northbound on I94 as the vehicle approached the Marquette interchange in Milwaukee, Wisconsin.

42.     On February 3, 2021, ATF Special Agent Rick Hankins reviewed Google data related to David GARNER.

43.     ATF previously obtained a Google reverse location search warrant regarding potential devices inside or near the Stella Hotel & Ballroom located at 5706 8th Avenue, Kenosha, Wisconsin on August 24, 2020.  The parameters of the information requested in the search warrant are detailed in Figure #1.

- Date: August 24, 2020
- Time Period: 9:25 PM to 9:45 PM (CST)
- Target Location: Geographical area identified as:
  42.583837, -87.820932; 42.583017, -87.820777; 42.582916, -87.821706; 42.583713, -87.821875
  Also approximately depicted using the following image:



*Figure 1*

44.     Google subsequently responded to the above search warrant request and provided information regarding multiple devices that were in the prescribed area detailed in Figure #1 between 9:25pm – 9:45pm.  The devices included device # -1126896735, which is a device associated with username David GARNER.  Information regarding GARNER'S device is found below, including GPS coordinates at specific times.  The last column provides an estimated radius of accuracy for the GPS coordinates in meters.  Google also provided a Google Subscriber

14

Information sheet for the GARNER device. A listed phone number for the account is (612) 422-2739.

| Device ID | Date | Time (America/Chicago -05:00) | Latitude | Longitude | Source | Maps Display Radius (m) | | |
|---|---|---|---|---|---|---|---|---|
| -1126896735 | 8/24/2020 | 21:34:38 (-05:00) | 42.5835306 | -87.821266 | WIFI | 17 | | |
| -1126896735 | 8/24/2020 | 21:36:40 (-05:00) | 42.5833529 | -87.8214982 | WIFI | 27 | | |
| -1126896735 | 8/24/2020 | 21:42:48 (-05:00) | 42.58365 | -87.8213012 | WIFI | 21 | | |

*Figure 2 - Google data regarding GARNER'S device locations*

45. Agent Hankins subsequently placed digital markers in chronological order for GARNER's device in Google Earth using the latitude and longitude coordinates provided by Google. The estimated locations for the device are shown in Figures #3.



*Figure 3 - Approximate locations of GARNER'S device according to Google data*

## TECHNICAL INFORMATION

46.     Based on my training and experience, I know that cellular telephone providers can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the cellular telephones to which they provide service, including by initiating a signal to determine the location of the cellular telephone on cellular telephone provider networks or with such other reference points as may be reasonably available.

47.     In my training and experience, I have learned that cellular telephone providers are companies that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone, but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

48.     Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the

customer was connected at the end of the communication; and (5) the duration of the communication.

49. Based on my training and experience, I know that cellular telephone providers can collect cell-site data about the cellular telephones using its network. I also know that wireless providers typically collect and retain cell-site and other cellular network data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. From this data, wireless providers can also estimate the historical locations of cellular telephones using their networks. These estimates are drawn from data collected in the normal course of business, including cell-site and other cellular network data.

50. I know that some providers of cellular telephone service, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. I also know that certain wireless providers can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

17

51.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identity ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

52.     Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.

## AUTHORIZATION REQUEST

53.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

54.     I further request that the Court direct the Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on the Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

19

**<u>ATTACHMENT A</u>**

**Matter No. 2020R00323**

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number (612) 422-2739 that is stored at premises controlled by New Cingular/AT&T, a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408.

**Matter No. 2020R00323**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to Account), for the time period from August 23, 2020 through August 25, 2020:

  a.   The following information about the customers or subscribers of the Account:

     i.   Names (including subscriber names, user names, and screen names);

     ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

     iii.   Local and long distance telephone connection records;

     iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

     v.   Length of service (including start date) and types of service utilized;

     vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

     vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, including the locations of any cell tower and antenna face; and

iii. historical location records (including historical locational precision information, historical handset location data, estimated location records, geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information).

c. A list of definitions or keys identifying all information contained in the records.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the federal prohibitions against conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n), and arson of commercial property, in violation of Title 18, United States Code, Section 844(i).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.